Strafford,
No. 5845.

## OSCAR H. BROWN

*v.*

## MONTGOMERY WARD & COMPANY.

Argued February 5, 1969.
Decided June 3, 1969.

*Burns, Bryant, Hinchey & Nadeau* and *Paul R. Cox* (*Mr. Cox* orally), for the plaintiff.

*Wiggin, Nourie, Sundeen, Nassikas & Pingree* and *Dort S. Bigg* (*Mr. Bigg* orally), for the defendant.

PER CURIAM. This is an action with counts in negligence, breach of warranty, and deceit, to recover for personal injuries sustained on July 7, 1964, as a result of a fall while using an aluminum extension ladder purchased from the defendant. A trial by jury resulted in a verdict for the plaintiff in the amount of $30,000. The exceptions of the defendant were transferred by *Morris, J.*

The ladder in question was purchased on June 6, 1964, when it was on sale as a loss leader for $5.77. There was some question as to who was the purchaser, but as the case comes to us no question of privity is being raised. Plaintiff was using the ladder for the first time on July 7, 1964, to repair a leak in the roof of the breezeway connecting his house and garage.

The ladder is generally constructed in the usual manner for extension ladders. That is, it is in two parts: a base ladder and a fly or extension part which runs up and down inside the base. Hooks which are attached to the fly hook over the rungs of the base to hold the fly from sliding back down when it is extended. If, after the hooks are secured over the rung, the fly is raised so that the hooks become disengaged, hinged flippers close against the hooks so that the fly may be lowered without catching the rungs in the hooks.

The ladder in question is eight feet long when in a closed position. The roof of the breezeway is eight feet, eight inches from the ground. The plaintiff testified that he extended the ladder and placed it in position against the breezeway with probably one rung above the roof line. He testified that he ascended the ladder, got off onto the roof, made the repair and

proceeded to descend the ladder. He said that when he put his weight on the ladder it "started to go." He said it seemed to be moving toward the right. He fell to the ground and received the injuries of which he complains. There was evidence from which it could be found that in the course of the accident the ladder made a scrape mark on the face-board below the roof of the breezeway and went through a screen. It appears from photographs in evidence that the mark on the face-board is nearly vertical and the tear in the screen is nearly on a vertical line below the scrape on the face-board. There was testimony that certain marks on the top of the fly were consistent with having caused the scrape mark on the face-board.

While the accident was happening, a neighbor arrived on the scene. It could be found from his testimony that the ladder was in a closed position after the accident. Also, after the accident, the right foot (i.e., that part of the right side rail below the first rung) of both the base and the fly were bent inward, and from photographs taken shortly after the accident with the ladder extended and placed against the breezeway, it appears that they are bent at about the same angle. Any slight difference in angle could have occurred in the handling of the ladder after the accident as the bent part of the base was fractured at the bend and in fact fell off before the trial. An expert called by the plaintiff testified that the fracture occurred because of a bending and twisting of the ladder, at a point where its design introduced an unnecessary weakness.

An expert for the defendant, an employee of the manufacturer of the ladder, testified that marks, scratches, and gouges in the bent leg of the base were duplicated on the bent leg of the fly, and expressed the opinion that the bends occurred when the ladder was in a closed position. On cross-examination, he testified that in his opinion the bends occurred when the plaintiff stepped on the fly, which was extended but not locked, and rode it down so that the leg of the fly wedged into the foot of the leg of the base. He said that a fall of two or three feet would cause an impact equal to about twice the plaintiff's weight which was about 169 pounds.

The Trail Judge, subject to exception, on motion of the plaintiff withdrew the issue of the plaintiff's contributory negligence from the jury and instructed the jury as follows: "There is no issue of contributory negligence in this case. That is, the issue of contributory negligence is taken from you." We agree with

the defendant that this was error. In passing on the issue thus raised the evidence and all reasonable inferences must be considered most favorably to the defendant. See *Zellers* v. *Chase,* 105 N. H. 266. It was findable that the failure of the legs of the base and fly occurred while the ladder was in a closed position. From this it can be inferred that the fly ran down under the weight of the plaintiff when he stepped on it. Since the ladder would not reach the roof in a closed position, it must have been extended when plaintiff ascended and when he started to descend. This accords with plaintiff's testimony. It was also findable that the fly would not close with plaintiff's weight on it if it was properly hooked even if the base leg had given way causing the ladder to fall to the right. It is inferrable from this, therefore, that the hooks were not properly secured over the rungs of the base when the plaintiff started to descend. Since there was testimony that the fly would not hold more than 25 pounds if not hooked, it could be found that the hooks were disengaged after plaintiff's ascent.

The jury were entitled to find from plaintiff's testimony that there was only one rung of the fly above the roof when he went up. It was findable that, while this would permit a person to get from the ladder to the roof with comparative ease, it would be difficult to get onto the ladder to descend. From all the evidence, the jury could find, despite his denial, that the plaintiff pulled up on the fly before descending in order to get more ladder above the roof and failed to properly set the hooks before stepping on the fly.

The fact that the marks on the face-board of the roof and the damage to the screen were on a nearly vertical line would permit but not require the inference that the fly was closing at the time this damage to the face-board and screen occurred.

The question whether the plaintiff rode the unhooked fly down was important, not only on the issue of the plaintiff's fault, but also on the issue of the defendant's violation of duty in both contract and tort. If the bending of the legs occurred as a result of the plaintiff's riding the fly down, this would not be the normal or expectable strain that the ladder would be guaranteed to withstand. Also, the fact that the ladder bent or broke under such circumstances might not show fault on the part of the defendant. There was evidence from which the jury could find the plaintiff negligent although a contrary finding was also warranted.

Defendant urges that certain testimony of plaintiff's expert should have been stricken. He testified that certain notches in the holes in the side rails, which were made to prevent the rungs from turning, weakened the rails and particularly since the notch came where the hole was close to the edge of the rail. He said this was the weakest point in the rail and that is where the bend and break occurred. He also said that an I-beam construction for the side rails would have been stronger. He used the word "failure" repeatedly and referred to the ladder as having "failed." He could not say, however, that it would not have failed under the circumstances if its construction had met his requirements. This was because he did not know the circumstances under which the ladder broke. He could not, therefore, say whether the accident caused the "failure" or the "failure" caused the accident.

While his use of the word "failure" appears to have been used in the scientific sense rather than denoting in itself fault on the part of the defendant, and could have been confusing to the jury, we cannot say that the matter was not clarified by cross-examination.

We do not think the Court erred in not striking the testimony of this expert. It was for the jury to decide how the accident occurred. If they found that the ladder "failed" during normal use as plaintiff put his weight on it and not from his riding the fly down, then it could be found that the "failure" was due to improper construction.

Defendant also contends that the Trial Court erred in not permitting its expert to give his opinion on certain matters. Trial Judges have wide discretion with respect to the admission and exclusion of opinion evidence. *Gauthier* v. *Bergeron,* 107 N. H. 153; *Cormier* v. *Conduff,* 109 N. H. 19. Since there is to be a new trial, no useful purpose would be served by reviewing the discretionary action of the Trial Justice at the first trial.

Defendant contends that certain Veteran's Hospital records of the plaintiff and certain reports of doctors, all relating to plaintiff's condition prior to the accident of July 7, 1964, were erroneously excluded. It appears to us that those parts of the records offered through the custodian which contained the history of plaintiff's physical condition given by him (some of which were signed by him) and the observations of the doctors as to his posture and gait were clearly admissible against him. *Williams* v. *Williams,* 87 N. H. 430; *St. Louis* v. *Railroad,* 83

N. H. 538; RSA 521:2. It does not appear, however, that those admissible parts which were excluded were ever offered separately from the rest of the record which contained certain expert opinions. Such opinions were properly excluded in the Court's discretion under RSA 521:2. They were also properly excluded under the principles of *O'Haire* v. *Breton*, 102 N. H. 448 and *LeBrun* v. *Railroad*, 83 N. H. 293.

Defendant called as a witness one of the Veteran's Administration doctors, and through his testimony and the introduction of his report, evidence of plaintiff's condition prior to the accident was introduced. Considering the record as a whole, we find no prejudicial error relating to these records and reports.

*New trial.*

LAMPRON, J., did not sit.